UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
_____

In re:
                                                    CASE NO. 05-21316
PAUL W. O'BRIEN,

                              Debtor.               DECISION & ORDER
_____

KATHLEEN D. SCHMITT, ASSISTANT
UNITED STATES TRUSTEE, RICHARD P.
VULLO, CHAPTER 7 TRUSTEE and
COLONIAL SURETY COMPANY,
                              Plaintiffs,

              v.                                    AP NO. 06-2062

PAUL W. O'BRIEN,

                              Defendant.
_____

BACKGROUND

On March 24, 2005, Paul W. O'Brien (the "Debtor") filed a petition initiating a Chapter 7 case, and Richard P. Vullo, Esq., (the "Trustee") was appointed as his Chapter 7 Trustee. Along with his petition, the Debtor filed the Schedules and Statements required to be filed by Section 521 and Rule 1007 (the "Initial Schedules") and (the "Initial Statement of Affairs").

The Initial Schedules indicated that: (1) Colonial Surety Company ("Colonial") was his only unsecured creditor, which he scheduled as having an unliquidated, disputed claim in the amount of $500,000.00 for a "Guarantee on Payment Bond issued for Genesee Valley Nurseries, Inc.; includes personal liability for bonding

companies legal expense";[1] (2) he was employed as an investment banker by Paramax Capital Formation Group Corporation ("Capital Formation"); (3) he had no outstanding accounts receivable (Question 15 of Schedule B, Personal Property); and (4) he had no other liquidated debts owing to him (Question 17 of Schedule B, Personal Property).

The Initial Statement of Affairs indicated that: (1) his only payments to creditors within the 90 days immediately preceding the commencement of his case were his regular first and second monthly mortgage payments (Question 3); and (2) the only transfer outside the ordinary course of his business and financial affairs within one year immediately preceding the commencement of his case was a transfer of his interest in their residence to Diane O'Brien on May 20, 2003 (Question 10).

On May 17, 2006, the Office of the United States Trustee (the "U.S. Trustee") and the Trustee, as joint Plaintiffs, commenced an Adversary Proceeding (the "727 Proceeding"), which requested that the Court deny the Debtor's discharge pursuant to Section 727.

The Complaint in the 727 Proceeding set forth a number of causes of action under Section 727, including causes of action

---

[1] In March of 2001, the Debtor's spouse, Diane O'Brien, and his daughter filed Chapter 7 bankruptcy cases after the Genesee Valley Nurseries, Inc. business, which the daughter operated, terminated. The fallout from this failed business has cost the Debtor and his family a significant amount of money and resulted in unanticipated and unfortunate stress and disruption to their lives.

**Page 2**

under Section 727(a)(4)(A)[2] for false oath or accounts, which alleged that the Debtor failed to disclose: (1) on his Initial Schedule B and at his initial Section 341 Meeting of Creditors (the "341 Meeting"), approximately $70,000.00 in salary for periods prior to the commencement of his case, owed to him from his employer, Capital Formation; and (2) on his Initial Statement of Affairs and at his 341 Meeting, a transfer to Diane O'Brien of $17,000.00 on March 22, 2005, the day he executed his Initial Schedules and Initial Statement of Affairs; and (3) on his Initial Statement of Affairs and at his 341 Meeting, a transfer to BPL Group, L.P. ("BPL") of $10,000.00 on March 18, 2005, which the U.S. Trustee asserted was in repayment of a loan made to the Debtor by BPL.

On June 16, 2006, the Debtor interposed an Answer to the Complaint, which can best be described as a general denial.

On November 1, 2006, Colonial filed a Motion to Intervene in the 727 Proceeding, which included a Complaint that requested a denial of the Debtor's discharge pursuant to Section 727. On

---

[2] Section 727(a)(4)(A) provides that:

(a) the court shall grant the debtor a discharge, unless --

(4) the debtor knowingly and fraudulently, in or in connection with the case --

(A) made a false oath or account[.]

11 U.S.C. § 727 (2007).

**Page 3**

December 18, 2006, the Court entered a Stipulated Order allowing Colonial to intervene in the 727 Proceeding.

On June 11, 2007, the Court entered an Order permitting the attorneys of record for the Debtor to withdraw, which was granted after the Debtor indicated that he had no objection to the withdrawal. At that time, the Debtor also indicated that he would represent himself in the 727 Proceeding.[3]

On June 20, 2007, the Court entered an Order granting the requests of the U.S. Trustee and the Trustee to amend their Complaint in the 727 Proceeding, which they made orally at a June 14, 2007 pre-trial conference, in order to add the following additional Section 727(a)(4)(A) causes of action: (1) the Debtor failed to disclose on his Initial Schedule B his joint interest with Diane O'Brien in a timeshare; and (2) the Debtor failed to disclose, on his Initial Schedule B and at his 341 Meeting, a $1,500.00 debt owed to him from Capital Formation, which was the result of a loan made by him to Capital Formation on March 2, 2005.[4]

---

[3] The Debtor holds a law degree from Georgetown University and a Masters in Business Administration (an "MBA"). He was a Vice-President of Finance for Bausch and Lomb in its mergers and acquisitions area, and is a retired Marine Corps Colonel. As a result, the Court determined that the Debtor was more than capable of representing himself in the 727 Proceeding.

[4] This loan was repaid to the Debtor post-petition.

Page 4

On August 7, 2007, the Court conducted a Trial in the 727 Proceeding at which the Trustee and the Debtor testified and various exhibits were entered into evidence.

The Trustee testified that: (1) at the Debtor's 341 Meeting he had the Debtor confirm that he: (a) was familiar with and had reviewed his Initial Schedules and Initial Statement of Affairs, and, to the best of his knowledge, they were true and correct; (b) had listed on his Initial Schedules all of his assets, including any and all claims that anyone had against him; (2) in view of the Debtor's significant annual income and complex business interests, he had requested that the Debtor provide him with: (a) copies of monthly statements for his Merrill Lynch Checking Account (the "Merrill Lynch Account") for the months of January, February and March 2005; and (b) a cash flow statement for the period from January 1, 2005 to March 31, 2005; (3) he subsequently asked the Debtor for other post-petition financial information, including additional monthly statements for his Merrill Lynch Account; and (4) it was only as the result of his extensive investigation into the financial affairs of the Debtor and a deposition conducted by Colonial, that the Trustee and Colonial learned that: (a) the Debtor was owed prepetition wages from Capital Formation (the "Back Wages"); (b) the Debtor had transferred $17,000.00 from his Merrill Lynch Account to Diane O'Brien on March 22, 2005, two days before

**Page 5**

the filing of his petition (the "Spousal Transfer"); (c) the Debtor had repaid $10,000.00 to BPL within one week before the filing of his petition (the "BPL Repayment"); (d) Capital Formation had repaid the Debtor a $1,500.00 prepetition loan (the "Capital Formation Loan Receivable") after the filing of his petition; and (e) the Debtor was the co-owner with Diane O'Brien of a timeshare (the "Timeshare").

At Trial, the Debtor: (1) testified that, although there were seven months of Back Wages due him from Capital Formation when he signed and filed his Initial Schedules ($10,833.33 x 7 = $75,833.31), which were paid to him post-petition in December 2005, he did not disclose them on his Initial Schedule B or to the Trustee at his 341 Meeting, because he had determined and believed that those Back Wages were not collectible in view of the financial condition of Capital Formation; (2) confirmed that he did not advise the Trustee when he was paid the Back Wages in December 2005; (3) testified that he did not disclose the Spousal Transfer on his Initial Statement of Affairs or to the Trustee at his 341 Meeting, because, based upon discussions with his attorneys, he believed the funds transferred were exempt property by reason of New York Civil Practice Law and Rules Section 5205(d)(2) ("CPLR

**Page 6**

Section 5205(d)(2)")[5]; (4) testified that he did not disclose the BPL Repayment on his Initial Statement of Affairs or to the Trustee at his 341 Meeting, because: (a) although he received: (i) an advance of $10,000.00 from BPL on January 1, 2005; (ii) a second advance on March 2, 2005, which all the other principals received; and (iii) a distribution of $32,000.00 on March 18, 2005, which all the other partners received, the partners were only supposed to receive total advances and distributions of $42,000.00 against their share of 2004 income, so they could pay their 2004 income taxes; (b) when he received the March 18, 2005 distribution (the "BPL Distribution"), because of the January advance he had received, he had been paid $10,000.00 more than he and the other partners were supposed to receive, so he simply repaid the $10,000.00 contemporaneously with receiving the March 18, 2005 distribution; and (c) he considered this to be a mere bookkeeping adjustment, rather than the repayment of the January advance, even

---

[5] CPLR Section 5205(d)(2) provides that:

(d) Income exemptions. The following personal property is exempt from application to the satisfaction of a money judgment, except such part as a court determines to be unnecessary for the reasonable requirements of the judgment debtor and his dependents:

2. ninety per cent of the earnings of the judgment debtor for his personal services rendered within sixty days before, and at any time after, an income execution is delivered to the sheriff or a motion is made to secure the application of the judgment debtor's earnings to the satisfaction of the judgment[.]

N.Y. CPLR § 5205(d)(2) (2007).

though on his Merrill Lynch Account ledger (the "Check Ledger") he designated the $10,000.00 payment as one to CFG for "repay loan";[6] (5) testified that he did not disclose the Capital Formation Loan Receivable on his Initial Schedule B or to the Trustee at his 341 Meeting, because, even though he had made a short-term loan to Capital Formation on March 2, 2005, so that it could make payroll for another employee, at the time when he was preparing to file his petition and was working on his Initial Schedules and Initial Statement of Affairs, he was focused on his complex business interests and how to schedule and value them, and his failure to disclose the Capital Formation Loan Receivable was simply an oversight and honest mistake; and (6) testified that he did not disclose the Timeshare on his Initial Schedule A, Real Property, on his Schedule B or to the Trustee at his 341 Meeting, because: (a) he believed that Diane O'Brien was the sole owner of the Timeshare, since the monthly installments to pay the purchase price of the Timeshare, after an initial down payment also made by her, came directly from a bank account maintained solely by her; and (b) it was only post-petition when he reviewed the ownership documents that he realized that he was listed as a co-owner.

---

[6] The Check Ledger shows the advances and distributions as coming from "CFG," which may be CFC Capital Management, L.P./Fund II, which the Debtor scheduled as a partnership which he had an interest in. However, in his testimony at Trial the Debtor indicated it was a series of transactions with BPL.

**DISCUSSION**

**I.     Section 727(a)(4)(A) Causes of Action**

   **A.   Case Law**

From the cases which have been decided under Section 727(a)(4)(A), including this Court's Decisions & Orders in *In re Pierri,* Ch. 7 Case No. 97-20461, A.P. Case No. 97-2125 (W.D.N.Y. April 21, 1998), *In re Wackerman,* (Chapter 7 Case No. 99-20709, W.D.N.Y. November 27, 2000) ("*Wackerman*"), In *re Ptasinski* (Chapter 7 Case No. 02-20524, A.P. Case No. 02-2172, W.D.N.Y., February 13, 2003), *In re Weeden* (Chapter 7 Case No. 02-23812, A.P. Case No. 03-2003, W.D.N.Y. February 17, 2004), *In re Foxton* (Chapter 7 Case No. 04-22377, A.P. Case No. 04-2154, W.D.N.Y. April 12, 2005), *In re Mondore* (Chapter 7 Case No. 04-21316, A.P. Case Nos. 04-2124 and 04-2130, W.D.N.Y. June 14, 2005), *In re Hutchinson* (Chapter 7 Case No. 04-25436, A.P. Case No. 05-2027, W.D.N.Y. August 2, 2005), and *n re Hoyt* (Chapter 7 Case No. 03-20001, A.P. Case No. 05-2023, W.D.N.Y. February 8, 2006), we know that for the Court to deny a debtor's discharge because of a false oath or account: (1) the false oath or account must have been knowingly and fraudulently made, *see Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244 (4th Cir. 1994); (2) the required intent may be found by inference from all of the facts, *see 6 L. King, Collier on Bankruptcy*,

¶727.04[1][a] at 40 (15th ed. rev. 2005); (3) a reckless disregard of both the serious nature of the information sought and the necessary attention to detail and accuracy in answering may rise to the level of the fraudulent intent necessary to bar a discharge, *see In re Diorio*, 407 F.2d 1330 (2d Cir. 1969); (4) a false statement resulting from ignorance or carelessness is not one that is knowing and fraudulent, *see Bank of Miami v. Espino (In re Espino),* 806 F.2d 1001 (11th Cir. 1986); (5) the required false oath or account must be material; and (6) the required false oath or account may be a false statement or omission in the debtor's schedules or a false statement by the debtor at an examination at a creditors meeting, *see In re Ball*, 84 B.R. 410 (Bankr. D.Md. 1988). Conversely, if items were omitted from the debtor's schedules because of an honest mistake or upon the honest advice of counsel, such a false declaration may not be sufficiently knowingly and fraudulently made so as to result in a denial of discharge.

### B. <u>Overview of the Debtor's Background</u>

At the time of the filing of his petition, the Debtor, who holds a law degree and an MBA, was an investment banker who previously was a Vice President of Finance in the mergers and acquisitions area of Bausch & Lomb, Inc., a Fortune 500 Company. As a result, this highly sophisticated Debtor knew the importance of full and complete disclosure. In the mergers and acquisitions

**Page 10**

area, due diligence is critical, and the failure to provide full and complete disclosure, given the extensive warranties and representations that are generally required in significant merger and acquisition transactions, are both a concern and a priority that the Debtor lived with every day. Notwithstanding this background, the evidence presented in the 727 Proceeding clearly demonstrated that the Debtor ignored the obvious purpose of fully and accurately completing bankruptcy schedules and statements - the full and complete disclosure of all assets, liabilities and financial affairs so that a trustee and creditors in a Chapter 7 case can fully investigate a debtor's financial affairs and properly administer the case and any and all nonexempt assets.

### C. **The Back Wages**

The failure of the Debtor to disclose the Back Wages in his Initial Schedules and at his 341 Meeting was a knowing and fraudulent false oath that alone warrant the denial of his discharge under Section 727(a)(4)(A), for the following reasons:

1. At Trial, the Debtor testified that he failed to schedule or disclose the Back Wages because he honestly believed that they were not collectible, and that if he had been asked to prepare a personal financial statement on the date of the filing of his petition, he would not have included those Back Wages as an asset. However, the

Page 11

>Debtor also acknowledged that, at the time he filed his petition, he could have commenced a lawsuit against Capital Formation and recovered a judgment for those Back Wages which were contractually due and owing under a written employment agreement.[7]

2. It is clear from the Debtor's testimony that he knowingly failed to schedule and disclose his right to the Back Wages, since he acknowledged that he was aware that they were legally due and owing. His asserted reason for non-disclosure was his unilateral determination that, because he believed they were uncollectible, he was not required to disclose them, which this Court does not find credible.

3. There was no testimony at Trial by the Debtor that he ever advised his attorneys about the existence of the Back Wages or his determinations of uncollectiblity and not being required to disclose them.

4. Schedule B requires a debtor to list the "Description and Location of Property" and then its "Current Market Value." Question 17 of Schedule B required the Debtor to

---

[7] There was extensive litigation in the Debtor's Chapter 7 case over the extent of the Debtor's interest in $163,000.00 paid to him in December 2005, representing fifteen monthly payments of $10,833.33 under his employment agreement; specifically what amounts represented prepetition, unpaid, monthly back wages. In a May 15, 2007 affidavit, the Debtor acknowledged that at least seven monthly payments were for prepetition back wages.

Page 12

      list "other liquidated debts owing." Clearly the Debtor was required to list the contractually due Back Wages as a liquidated debt, and then, if he chose to, he could have expressed his opinion that they had no value because they were uncollectible.

5. The Debtor, as an attorney, even if not a bankruptcy specialist, with an MBA was used to reviewing in detail and filling out legal documents, had to have known that the Back Wages were required to be disclosed if he had taken the necessary time and care to read, complete and review his Schedules, which this Court believes that he did.

6. As a result of his knowing, willful and deliberate failure to disclose the existence of the Back Wages, which the Court finds was with fraudulent intent, the Debtor deprived the Trustee and Colonial of the ability to pursue the collection of those Back Wages in connection with the administration of his Chapter 7 case.

7. Even more troubling is that the Debtor did not advise the Trustee of the receipt of those Back Wages in December 2005, and he only disclosed them after the Trustee learned they had been paid. This further supports a

Page 13

      finding that the failure to disclose was with fraudulent intent.

8. The undisclosed Back Wages of more than $70,000.00 were a substantial and material asset for purposes of Section 727(a)(4)(A).

9. The Debtor's failure to disclose the: (a) Back Wages; (b) Spousal Transfer, which was from funds received from an entity that he was an investor in; (c) BPL Repayment; and (d) Capital Formation Loan Receivable, show a pattern of non-disclosure of significant transactions with entities that the Debtor was employed by or invested in. This pattern further supports a finding of knowing and fraudulent intent with respect to the non-disclosure of these assets or transfers.

### D. The Spousal Transfer

The failure of the Debtor to disclose the Spousal Transfer in his Initial Statements and at his 341 Meeting was a knowing and fraudulent false oath that alone warrant the denial of his discharge under Section 727(a)(4)(A), for the following reasons:

1. On March 16, 2005, the Check Ledger (U.S. Trustee Exhibit 28 at Trial, Colonial Exhibit 31 at Trial), indicated that he had $1,767.07 on deposit in the Merrill Lynch Account. These were the only funds still on deposit in

     the Account that could have been for earnings of the Debtor for services rendered within the prior sixty days.

2. Then on March 18, 2005, the Debtor received the $32,000.00 BPL Distribution, which he testified at Trial was with respect to his 2004 phantom income from the partnership. As such, they were not earnings for personal services rendered within sixty days, as required by CPLR Section 5205(d)(2).

3. There were no additional deposits made into the Merrill Lynch Account before the Spousal Transfer from the Account on March 22, 2005, so that the funds transferred to Diane O'Brien, except possibly to the extent of $1,767.07, were clearly not from earnings for personal services rendered by the Debtor within sixty days.

4. Once again, the Debtor knowingly failed to fully and accurately complete his Schedules and Statements. Question 10 of the Debtor's Initial Statement of Affairs required that he "list all property transferred either absolutely or as security within one year immediately preceding the commencement of this case." It does not except the reporting of transfers of property claimed by a debtor to have been of exempt property.

5. Although the Debtor testified at Trial that he learned about the CPLR Section 5205(d)(2) exemption from his attorneys, and determined that the Spousal Transfer was less than ninety percent (90%) of the $19,567.90 he earned within the prior sixty days, clearly the Spousal Transfer was not made with any more than $1,767.07 of those earnings, since, to the extent that other earnings for the sixty-day period may have been received by the Debtor, he had paid them out prior to the Spousal Transfer.

6. Furthermore, it is doubtful that the Debtor's attorneys actually knew that the Spousal Transfer was being made primarily from funds that were not earnings for services rendered within sixty days, but were specifically from the BPL Distribution, funds that were on account of 2004 income.

7. In addition, the Debtor testified that the Transfer was made so that these funds would not be "frozen" in the bankruptcy, which supports a finding of fraudulent intent and, as set forth above in this Decision & Order, the underlying asset transferred consisted primarily of funds received from an entity that the Debtor was invested in,

Page 16

further demonstrating a pattern of non-disclosure and supporting a finding of fraudulent intent.

8. If the Debtor believed from the conversations with his attorneys that the funds transferred were actually exempt, even though it would require that he ignore the sixty day services rendered requirement, and he had transferred them, so they would not be "frozen," there is no explanation for failing to disclose the transfer other than to hide its existence from the Trustee and Colonial.

9. As with the Back Wages, the Debtor, by not scheduling and disclosing the Spousal Transfer, deprived the Trustee and Colonial of the ability to recover all or part of the Transfer, if this Court determined that all or part of the Transfer did not consist of CPLR Section 5205(d)(2) exempt funds.

10. This undisclosed Spousal Transfer of nonexempt funds of more than $15,000.00 for no consideration was material for purposes of Section 727(a)(4)(A).

**E.  The BPL Repayment**

Question 3 of the Statement of Financial Affairs required the Debtor to "list all payments on loans, installment purchases of goods or services, and other debts, aggregating more than $600.00 to any creditor, made within 90 days immediately preceding the

commencement of this case." Notwithstanding the assertion by the Debtor that he considered the $10,000.00 check that he drew to Capital Formation and listed on his Check Ledger for "repay loan" was a mere bookkeeping adjustment or a contemporaneous offset transaction, the Ledger speaks for itself. The Court finds this assertion not to be credible given the Check Ledger entry and the pattern of non-disclosure with respect to transactions with entities the Debtor was employed by or invested in, which supports a finding of fraudulent intent.

Once again, because the Debtor unilaterally determined that the BPL Repayment did not have to be scheduled or disclosed on Question 3 of his Initial Statement of Affairs, the Trustee and Colonial were deprived of the ability to investigate and determine whether they believed there had been a preferential loan repayment that could be recovered for the estate.

### F. Capital Formation Loan Receivable

The Check Ledger shows that the Capital Formation Loan Receivable of March 2, 2005 was repaid to the Debtor on March 25, 2005, two days after he filed his petition and the entry on the Ledger is for "loan repmt."

Although the Debtor testified at Trial that he did not knowingly, intentionally and fraudulently fail to schedule and disclose the Capital Formation Loan Receivable as an asset, because

**Page 18**

**BK. 05-21316**
**AP. 06-2062**

it was just a minor financial transaction that he had overlooked, it clearly was required to be scheduled as an "accounts receivable" on Question 15 of Schedule B, or as an "other liquidated debt owed to the debtor" on Question 17 of Schedule B.

Even more troubling is that after the Capital Formation Loan Receivable was repaid and the Debtor deposited the Capital Formation check and listed it on the Check Ledger as a "loan repmt," he failed to advise either his attorney or the Trustee about it or turn the repayment over to the Trustee. This supports a finding that the failure to disclose this asset on his Initial Schedules was with fraudulent intent.

Also, this non-disclosure is another component of the pattern of non-disclosure involving the Debtor's transactions with entities he was employed by or invested in.

### G. The Timeshare

The existence of the Timeshare was discovered as the result of an entry in the Check Ledger for the payment of maintenance fees in connection with the Timeshare.

Although further discovery might indicate that there was knowledge or reason for the Debtor to know that he was listed as a co-owner,[8] because the Debtor's knowing and fraudulent false oaths

---

[8] For example, that the maintenance bills always came in joint names, which would be inconsistent with sole ownership by Diane O'Brien.

**Page 19**

**BK. 05-21316**
**AP. 06-2062**

in failing to disclose the Back Wages, Spousal Transfer, BPL Repayment and Capital Formation Loan Receivable warrant the denial of his discharge under Section 727(a)(4)(A), it is not necessary for the Court to make a specific ruling at this time with regard to the Timeshare.

### CONCLUSION

For the reasons set forth in this Decision & Order, finding that the Debtor made knowing and fraudulent false oaths regarding the Back Wages, Spousal Transfer, BPL Repayment and Capital Formation Loan Receivable, his discharge is denied pursuant to Section 727(a)(4)(A).

**IT IS SO ORDERED.**

                                                    **/s/**
                             **HON. JOHN C. NINFO, II**
                             **U.S. BANKRUPTCY JUDGE**

**Dated: October 19, 2007**